IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 20, 2008

Charles R. Fulbruge III
Clerk

No. 07-60376

PATRICK JOSEPH ESSINGER, SR, individually and as administrator of the estate of Jolee Paige Essinger, deceased; CONSTANCE LORRAINE ESSINGER, individually, and as administrator of the estate of Jolee Paige Essinger, deceased

Plaintiffs - Appellants

v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before DAVIS and SOUTHWICK, Circuit Judges, and CLARK, District Judge.[*]

SOUTHWICK, Circuit Judge:

A policy-holder brought suit for punitive damages against its insurance company for a failure to recognize the effect of Mississippi law on the calculation of benefits that were owed. The district court granted the company's motion for summary judgment, finding no malice or gross negligence in the company's initial failure to understand how state law affected what was owed.

We affirm.

---

[*] District Judge of the Eastern District of Texas, sitting by designation.

## I. Facts and Procedural History

On August 5, 2002, seventeen-year-old Jolee Paige Essinger was killed in a single-car accident in which she was a passenger. Her parents are the plaintiffs in this litigation. The driver was Tabitha O'Brien, and there was another passenger, Christopher Gore. O'Brien lost control while negotiating a curve, causing the vehicle to overturn. O'Brien and Gore sustained injuries, while Jolee Essinger was pronounced dead at the scene.

This case involves two insurance policies. One was purchased by Kevin Speice, a resident of Pennsylvania, who owned the single vehicle involved in the accident. Speice maintained coverage under a State Farm policy providing $25,000 in liability coverage for bodily injury, $15,000 in uninsured motorist's coverage, and $10,000 in medical payments coverage.

Jolee Essinger was insured under a policy purchased from the Defendant Liberty Mutual by her parents, Patrick and Constance Essinger. The relevant coverage under the Liberty Mutual policy was $50,000 in uninsured motorist's coverage for each of the Essingers' two vehicles and $1,000 in medical coverage. The driver, O'Brien, had no insurance. Therefore, the claims made after the accident for insurance benefits solely involved the State Farm and Liberty Mutual policies.

On September 11, 2002, the Essingers notified Liberty Mutual of their daughter's accident and death. Mr. Essinger stated in his deposition that he called Liberty Mutual inquiring whether there were benefits to defray Jolee's funeral expenses. Liberty Mutual records indicate that Mr. Essinger called the "800 Center" and inquired whether "he is due anything under his policy." The following day, Liberty Mutual's Eathel James spoke to Mr. Essinger and mailed a letter advising the Essingers of the $1,000 of medical payments coverage. A medical payments claim form was included with the letter. Liberty Mutual's letter stated that "Your policy has a limit of $1000.00 per person."

2

On September 19, 2002, James again spoke with the Essingers and advised them to submit documentation about funeral expenses and any funds received from other insurance companies. The Essingers responded with relevant documents. Liberty Mutual issued the Essingers a check for $1,000 on October 14, 2002, and took no further action on the file at that time.

In the record is a letter from the Essingers, dated October 25, 2002, that was addressed to Eathel James at Liberty Mutual. The letter stated "My daughter's Estate is receiving $25,000 from State Farm. State Farm's insurance information is enclosed. Please let me know if the Estate is entitled to any further recovery from Liberty Mutual." Liberty Mutual's brief states that "there is no evidence that Liberty Mutual ever received this letter." The parties do not discuss whether this letter created some duty on Liberty Mutual's part. Thus, the fact issue of whether it was ever received is immaterial to the appeal.

On January 28, 2003, the Essingers' daughter, Rebecca Weyant, contacted Liberty Mutual to initiate an uninsured motorist claim. The following day, Liberty Mutual's Jennifer Gilcrease set up the claim, ordered the police report, and attempted to contact the Essingers at home. On January 31, 2003, Gilcrease sent the Essingers a letter with her contact information. Mrs. Essinger stated that during a phone call, adjuster Gilcrease asked whether the Essingers were going to retain counsel, then stated, "I don't care how many lawyers you get, you're only going to get $5,000." On the other hand, Gilcrease stated that Mrs. Essinger first asked if they should seek legal counsel, and Gilcrease responded that Gilcrease personally would not because an attorney would only take part of the settlement.

The Essingers initially retained attorney Bryan Vonder Bruegge, who contacted Gilcrease on February 11, 2003. Gilcrease told him that Liberty Mutual was prepared to pay $75,000. The attorney rejected the offer, asserting that Liberty Mutual owed $15,000 additional coverage but refused to explain

why. On February 12, 2003, after internal review and contact with State Farm to confirm its coverage and offer of policy limits, Liberty Mutual sent a letter to the Essingers' attorney offering a settlement of $75,000, which it stated to be the applicable policy limits available to the Essingers. It is undisputed, now, that the policy limit was actually $90,000 because of the operation of Mississippi caselaw that we will discuss.

On March 5, 2003, Gilcrease called the Essingers' attorney again. The attorney said that Liberty Mutual had not offered the policy limits and refused to explain his calculation. Gilcrease sent the attorney a letter asking for his analysis of the policy limits, but the Essingers' attorney did not respond.

On March 28, 2003, Gilcrease contacted State Farm's attorney. She was told that the State Farm policy provided a limit of $15,000 on uninsured or underinsured motorist coverage, and a limit on liability for bodily injury of $25,000. As a preview of what is ahead, we will note that the $15,000 uninsured motorist coverage under the State Farm policy is central to the misunderstood Mississippi law.

On April 3, 2003, Liberty Mutual received a letter from Robert Tyler, the Essingers' new attorney who was retained to handle a claim for bad faith against Liberty Mutual. The letter states that Liberty Mutual had a duty to be aware of state law in a jurisdiction in which it issues automobile policies, including the method of stacking of uninsured motorist benefits and credits or offsets and the manner in which they are computed for liability payments. He advised Liberty Mutual that it was not his position to render legal advice to Liberty Mutual and that the company should confer with Mississippi counsel on the subject.

Gilcrease contacted Liberty Mutual's Mississippi counsel, Rick Norton, who called Tyler. After State Farm's coverage was confirmed, Liberty Mutual then became aware that $90,000 was the policy limit after a set-off, not $75,000. The Essingers, through counsel, accepted the $90,000 settlement offer but

reserved the right to pursue claims against Liberty Mutual for its handling of the Essingers' claim.

On July 7, 2003, the Chancery Court of Harrison County, Mississippi, approved the settlement for the Essingers to receive $90,000 from Liberty Mutual and $25,000 from State Farm as administrators of Jolee's estate. Attorneys' fees were paid and the remaining funds were divided among seven wrongful death beneficiaries as determined by the Chancellor.

On December 29, 2005, the Essingers filed this action in the Circuit Court of Harrison County. Liberty Mutual removed the action to federal court, and filed a motion for summary judgment. The district court granted Liberty Mutual's motion for summary judgment on April 12, 2007. The Essingers timely appealed.

## II. Discussion

The sole issue the Essingers present in this appeal is whether the district court erred in granting summary judgment in favor of Liberty Mutual. The Essingers phrase the issue as whether Liberty Mutual "can be ignorant of Mississippi law, adjust a Mississippi claim in violation of Mississippi law, and not be subject to a jury finding that it committed bad faith." We review the district court's grant of summary judgment de novo, viewing the facts and inferences in the light most favorable to the nonmoving party. Armstrong v. American Home Shield Corp., 333 F.3d 566, 568 (5th Cir. 2003).

We examine first the error that Liberty Mutual committed in making its calculation of maximum liability, and then consider how that error fits under Mississippi caselaw on bad faith of insurance companies.

### 1. "Stacking"

The law that was misunderstood is called "stacking," a concept applicable to uninsured motorist coverage in insurance policies. Several Mississippi precedents have defined and refined the doctrine, as explained in detail in a

learned treatise. JEFFREY JACKSON, MISS. INS. LAW & PRAC., §§ 18:16-18:23 (2007). We start with one of the statutory definitions of an "uninsured motor vehicle." The definition applies "when the liability insurer of such vehicle has provided limits of bodily injury liability for its insured which are less than the limits applicable to the injured person provided under his uninsured motorist coverage." Miss. Code Ann. § 83-11-103(c)(iii) (2008). We thus compare the liability limits of $25,000 in the State Farm policy purchased by the owner of the vehicle in which she was riding, to all the uninsured motorist coverage ("UM coverage") to which Jolee Essinger was entitled. Her estate could draw on the $15,000 in UM coverage provided in the vehicle owner's State Farm policy. Mississippi law provides that Jolee Essinger's estate was also entitled to the UM coverage in her parents' policy that covered two of their vehicles. The separate $50,000 policy limit on each of those Essinger vehicles totaled $100,000. Thus, there was $115,000 worth of UM coverage available. The quoted statutory definition made the vehicle uninsured (or more aptly, underinsured) because the $115,000 of available UM coverage far exceeded the $25,000 of liability coverage. JACKSON, MISS. INS. LAW at § 18:16.

Added to that analysis is the unfortunate fact that because she was killed, Jolee Essinger's estate could claim damages far in excess of the liability limit. The UM provisions of the available policies were liable up to that limit.

This calculation still does not get us to what the Essinger estate could claim from both State Farm's policy on the vehicle involved in the accident and on her parents' policy with Liberty Mutual. Mississippi law permits an insurer to offset UM payments by its liability payments. Id. at § 18:25. State Farm had the liability coverage relevant to this accident, limited to $25,000 as noted already. State Farm was entitled to offset its $15,000 UM coverage in toto by the $25,000 liability payment. Id. (discussing Fidelity & Guar. Underwriters v. Earnest, 699 So. 2d 585, 587 (Miss. 1997)). Included in the record is a final

decree in the estate proceedings opened in Mississippi state court that authorized the Jolee Essinger estate to accept $25,000 from State Farm, not $40,000. That fully satisfied State Farm's obligations.

The last calculation is how much, if any, Liberty Mutual may offset its $100,000 UM coverage by State Farm's $25,000 payment. The answer comes explicitly from an older case which remains good law: "the uninsured motorists coverage of each policy of liability insurance is available to the injured insured until all sums which he shall be entitled to recover from the uninsured motorist have been recovered." Harthcock v. State Farm Mut. Auto Ins. Co., 248 So. 2d 456, 461-62 (Miss. 1971). As we have already discussed, the Essinger estate was entitled to $115,000 of uninsured motorist coverage. The estate had received $25,000 in liability payments from State Farm. Liberty Mutual was responsible for the remainder, or $90,000. See Dixie Ins. Co. v. State Farm Mut. Auto. Ins. Co., 614 So. 2d 918, 921 (Miss. 1992).

These rules, though somewhat complicated, are central components of Mississippi insurance law. The state's intermediate court once even stated that the doctrine was part of the "deeply ingrained and strongly felt public policy" of Mississippi. Bell v. Government Employees Ins. Co., 672 So. 2d 779 (Miss. Ct. App. 1995) (mem.) (unpub., and not precedent). Though the state's Supreme Court has not gone as far as that, the state Court of Appeals' fervor reveals that stacking is a well-known and, for many practitioners and judges, a passionately protected doctrine in the state.

It is that doctrine about which this Liberty Mutual adjuster lacked a complete understanding when assessing the claim. The difficulty for the adjuster arose from not having inquired about the separate UM coverage under the State Farm policy, not understanding the two UM coverages needed to be stacked, or not calculating the set-off. The fact that stacking is widely recognized as applicable does not mean its precise application is easily

understood. The Essingers' initial attorney, a Mississippi practitioner, did not consider insurance law a specialty. He stated in a deposition that he found stacking to be complicated. Because he had not recently re-examined its principles, he did not want to describe how the $90,000 demand had been calculated.

With this review of the proper calculation as the backdrop, we turn to whether bad faith as Mississippi defines it has been shown.

2. Overview of bad faith and extra-contractual damages

As we will detail, Mississippi caselaw provides for "extra-contractual damages" when an insurance company has tortiously breached its contract. That is because often an insurance company's financial default is less than the cost to the insured of judicially forcing a correct payment. When an insurance company breaches its contract with an insured but does not do so in a way that is so egregious as to permit the recovery of punitive damages (a recovery option we will discuss momentarily), the insured in some circumstances will have a right to attorneys' fees and other expenses that were reasonably foreseeable. Universal Life Ins. Co. v. Veasley, 610 So. 2d 290, 295 (Miss. 1992). The Essingers do not seek those damages, which are an intermediate form of relief between simply receiving incidental costs of suit (but not attorneys' fees and other damages), and getting punitive damages.

It is true that the Essingers earlier in the process kept open the possibility of pursuing this relief. The release the Essingers gave Liberty Mutual reserved the right to pursue claims "including, but not limited to, breach of contract and/or bad faith." Furthermore, the Essingers in the Complaint asserted a claim for "tortious breach of contract" and sought actual as well as punitive damages. The Plaintiffs' focus sharpened when they responded to Liberty Mutual's Motion for Summary Judgment that sought dismissal of all claims, explicitly including any claims for extra-contractual damages. The Plaintiffs' response was limited

to the their bad-faith claim.  Furthermore, when the district court dismissed the Essingers' complaint after discussing only the bad-faith claim, the Essingers never objected or sought clarification.  Finally, on appeal, the Essingers' sole argument is that the district court erred in dismissing their bad-faith claim.

Therefore, to the extent that the Essingers may have reserved a claim for extra-contractual damages from the release given Liberty Mutual or asserted such a claim in their complaint, the claim has been abandoned.  MacArthur v. Univ. of Texas Health Ctr., 45 F.3d 890, 895-96 (5th Cir. 1995).

Instead, the Essingers allege that Liberty Mutual committed what in Mississippi is usually labeled the tort of bad-faith refusal to pay a claim, but has also been described as bad-faith refusal to honor an obligation under an insurance contract.  JACKSON, MISS. INS. LAW, § 13:2.  Different precedents have emphasized different elements of the tort, so we find it helpful to state this summary, prepared by someone who made a careful review of all the caselaw:

> In order to recover punitive damages against an insurance company for bad-faith refusal to pay a claim, or refusal to honor an obligation under an insurance policy, the insured must first demonstrate that the claim or obligation was in fact owed. . . . Second, the insured must demonstrate that the insurer has no arguable reason to refuse to pay the claim or to perform its contractual obligation.  Finally, in order to recover punitive damages from the insurer for bad faith, the insured must demonstrate that the insurer's breach of the insurance contract "results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an intentional tort."

Id. (quoting Caldwell v. Alfa Ins. Co., 686 So. 2d 1092, 1095 (Miss. 1996)).

We draw from Professor Jackson's analysis these relevant questions:

(1) Was there a refusal to pay a claim or to honor an obligation?

(2) Was the claim actually owed?

(3) Was there no arguable basis for the company's actions?

(4) Did the company's actions amount to an intentional wrong or occur due to gross negligence?[1]

There is no doubt that the Essingers prevailed on their demand for $90,000 as opposed to the $75,000 that was offered. So the second factor is resolved. The third factor on an "arguable basis" is satisfied only "if the insurer has a reasonable legal or factual basis for denying or delaying payment on the claim." Andrew Jackson Life Ins. Co. v. Williams, 566 So. 2d 1172, 1184 & n.12 (Miss. 1990). This factor does not require that there be some unworthy motive, only that nothing legal or factual would have arguably justified the position taken. There was, then, no arguable basis for the position Liberty Mutual took that $75,000 was the policy limit.

Whether to sustain the district judge's decision therefore turns on only two of the factors: were Liberty Mutual's actions in the category (i.e., something akin to a denial) for which the egregiousness of the conduct becomes relevant? If so, were those actions at least grossly negligent? Because of our conclusion that no denial ever occurred, we examine only that issue.

3. Was there a denial of claim or failure to honor obligation?

A review of the record reveals several points at which Liberty Mutual may not have zealously responded to notice of the death of someone covered by their policy. Examples occurred in 2002, when the only response to the Essingers concerned the payment of the $1,000 medical expenses. The company was asked about those expenses, and reviewed only that limited claim. There is no evidence that Liberty Mutual in 2002 actively examined the policy for all

---

[1] Inordinate delays in processing claims and a failure to make a meaningful investigation have combined to create a jury question on bad faith. Lewis v. Equity Nat. Life Ins. Co., 637 So. 2d 183, 187-88 (Miss. 1994). The allegation in Lewis was a "bad-faith" failure to investigate the claim that was made. Liberty Mutual timely reviewed the January claim but made a mistake as to the applicable law that it corrected upon having the mistake explained. We find Lewis inapposite.

possible benefits that might be available under it.  The company's actions were narrowly focused on what the policy-holder requested.

Over an eight-month period, all the benefits due were paid.  The issue for the moment is whether Liberty Mutual's passivity in 2002 is the kind of situation that can be seen as an independent tort of bad faith in failing to honor an obligation under an insurance contract.  Our examination of Mississippi precedents reveals no example of insurance companies being found in bad faith when they respond accurately to the inquiries made but are not pro-active.  It is not clear that the Essingers even argued that the 2002 events are factually relevant for their claim.  It is true that the Essingers have asserted that they sent a letter on October 25, 2002, after receipt of the $1,000 payment, asking what other coverages might be available.  Liberty Mutual denied having received that letter, and more importantly, there is no evidence that the company responded to the letter by denying there were any other coverages.  For us to find the 2002 events are a basis for a bad-faith claim would be an extension of Mississippi law on the subject, a step we decline to take.

As to the 2003 actions, Liberty Mutual alleges that at most these facts show delay and not denial.  Liberty Mutual's errors about stacking resulted in the miscalculation of the maximum available coverage to the Essingers.  The Essingers would have us conclude that Liberty Mutual's offer of $75,000 as constituting the policy limits, was a denial of anything greater.  We turn to Mississippi law on whether these facts constitute a sufficient denial.

This court examined a Mississippi bad-faith claim that arose after insured and insurer failed to negotiate a settlement on the loss of a log skidder due to fire.  Tutor v. Ranger Ins. Co., 804 F.2d 1395 (5th Cir. 1986).  There was a four- to five-month gap between when the claim was made and suit was filed.  During that period, the insurance company investigated the loss, made an offer, requested additional information when the first offer was rejected, then made

a higher but still unaccepted offer. Id at 1396. Suit for bad-faith denial of the claim was filed while negotiations were still occurring. We found that because there never was a denial, the case involved only a dispute as to the correct value of the covered property. Id. at 1399. The issue of punitive damages should not have been submitted to the jury. Id.; see also, Guar. Serv. v. Am. Employers' Ins., 893 F.2d 725, 728 (5th Cir. 1990) (an insurer stated that it had not been given information required by the insurance contract to make a proper analysis of the claim, but did not deny coverage; punitive damages improper).

Somewhat similarly, the Mississippi Supreme Court held that a trial court correctly refused to submit the issue of punitive damages to the jury. Caldwell, 686 So. 2d at 1092. The estate for a person killed in a multi-vehicle accident filed a claim in February 1991, and the insurance company began its investigation. Id. at 1093-94. Counsel for that estate sent the insurer a demand letter setting a settlement deadline of April 1, 1991. Settlement was not reached by that date and suit was filed. Id. On May 28, 1991, after the investigation was complete, Alfa tendered its policy limits of $202,000. Id. The Court concluded that summary judgment in favor of Alfa was proper because the claim had never been denied, but payment was delayed pending a proper investigation. Id. at 1099.

To allow a comparison between what occurred in these precedents and the events here, we summarize Liberty Mutual's actions regarding the death claim. The almost ten weeks from January 28 until April 4, 2003, may be broken down conceptually into four periods. We look for whether a "denial of a claim" or refusal to honor an obligation occurred.

(1) From January 28 until February 12, Liberty Mutual processed the claim and offered what it perceived to be policy limits. The offer was rejected on February 11 by the Essingers' counsel on the telephone, but he would not explain his calculation; the adjuster's notes stated her confusion. On February

12

12, Liberty Mutual sent a letter to this attorney setting out the $75,000 offer, calling it the "available limits minus the off-set from the State Farm underlying coverage." The initial offer was the commencement of negotiations. True, because of its error, Liberty Mutual did not think it owed more. But that error could be corrected through negotiation. There was no "denial."

(2) From February 12 until March 5, Liberty Mutual apparently awaited a response to its letter. On March 5, an adjuster called the Essingers' counsel to determine where matters stood, and was told without explanation that the policy limits had not been offered. A letter was sent by the adjuster to counsel on March 5, requesting an explanation. We find no denial, as this second time period was part of the negotiation, with the error by Liberty Mutual being exacerbated by counsel's refusal to explain the problem.

(3) From March 5 until April 3, Liberty Mutual waited for the Essingers to respond. On March 28, the adjuster contacted State Farm and learned, or was again told, about the $15,000 additional UM coverage. On April 3, Liberty Mutual received a letter from the Essingers' new counsel stating that he had been hired to pursue a bad-faith claim and suggesting the adjuster talk to her own counsel to figure out why the policy limit was not $75,000. Here too we find no denial, as Liberty Mutual explicitly held open the door to considering further information from the Essingers on why more was owed.

(4) On April 3-4, Liberty Mutual's adjuster finally checked with counsel, learned that $90,000 was the proper amount, and started the internal process for getting the greater amount authorized and offered. Within days, the error was corrected and the proper amount was offered. Those last few days resolved the problem and do not constitute the denial needed.

During the ten weeks of the processing of the claim for UM benefits, Liberty Mutual created the problem for its insured by failing to understand what those who adjust insurance claims in Mississippi must know – how stacking and

set-off of UM coverages operate.  The company offered what it considered to be its policy limits, but at various points during the period under consideration, indicated that it would consider further information revealing where it was wrong.  There never was a denial of a claim or failure to honor an obligation as required to make a jury issue of bad faith.

At some point, an insurance company's conduct may reveal such a refractory attitude, such as rejecting reasonable responses from its claimant despite verbal indications of flexibility, that a denial might arise from what superficially appears to be negotiation.  We find no fact question here.  The district judge ruled in part on the basis that no denial of a claim occurred.  We find no dispute of material fact on that point.  There is no reason to discuss the remaining issue on the relative egregiousness of the conduct.

We cannot fail to note, though, that because of the insurance company's negligence in understanding Mississippi law, a substantial reduction occurred in the amount actually received by the Essingers following this tragic accident.  That reduction occurred because of the need to employ counsel to receive what was due.  We have found no denial of a proper claim, but there certainly was damage.  Extra-contractual damages might have been available to make the insured whole had they been pursued.  See Veasley, 610 So. 2d at 295.  It is, nonetheless, understandable that punitive damages were sought instead.

The judgment of the district court is AFFIRMED.